**Phillip HUELSMAN, Appellant,**

v.

**COMMONWEALTH of Kentucky,
Appellee.**

Supreme Court of Kentucky.

Oct. 28, 1977.

Rehearing Denied Dec. 9, 1977.

Jack Emory Farley, Public Defender, William M. Radigan, Asst. Public Defender, Frankfort, for appellant.

Robert F. Stephens, Atty. Gen., Mark Armstrong, Asst. Atty. Gen., Frankfort, for appellee.

PALMORE, Justice.

Phillip Huelsman and Newt Becknell were jointly indicted and tried for the murder of James Duncan, a service-station attendant. Each was found guilty and sentenced to life imprisonment under KRS 435.010, the statute in force on June 19, 1973, when the offense was committed.[1] Only Huelsman appeals.

The same attorney was appointed to and did represent both defendants. Huelsman's first contention is that this dual representation denied him the effective assistance of counsel and violated the rights guaranteed him by the 6th and 14th Amendments of the United States Constitution. He contends also that the admission into evidence of his confession without a preliminary evidentiary hearing to determine its voluntariness violated his constitutional right to due process of law.

At an early hour on June 19, 1973, Duncan was shot and killed while sitting asleep in his automobile at a service station. The resulting investigation led police officers to Huelsman, who signed a written confession on August 27, 1973. In summary, this confession recited the following facts:

On the night of June 18, 1973, while Huelsman and Becknell were at Becknell's home, Becknell said something about going to get some money. Huelsman asked, "Where are you going to get it at?" Becknell responded, "Knock off a filling station." Huelsman thought he was joking. Nevertheless, they drove to a service station in Grant County and discovered the attendant asleep in his automobile. Becknell pulled out a pistol and shot him. Huelsman, being until then unaware that Becknell had a gun, was "dumbfounded."

1. KRS 435.010 was superseded by the Kentucky Penal Code, effective January 1, 1975.

They both got out of the car, and Becknell went inside the service station looking for money but could not find any and made an unsuccessful attempt to pry open a vending machine. One of them (apparently Becknell) took the dead man's wallet, and they drove off. While en route, they found that the wallet contained but $2.00. Becknell gave Huelsman $1.00 and threw the wallet out of the car. Huelsman threw the $1.00 bill Becknell had given him out the window.

On August 28, the day after Huelsman had signed this confession, the investigating officers arrested Becknell and informed him that Huelsman had made a statement. Becknell admitted his own complicity in the crime and signed a confession giving this version:

On the night of June 18, 1973, Becknell and Huelsman were together at Frisch's restaurant in Florence, Kentucky. When the restaurant closed, they went to Becknell's home in an automobile that belonged to Huelsman's girl-friend. Huelsman was drinking, and Becknell was "downing soapers."[2] At about a quarter of one Huelsman started "talking about the money. I was strung out. He said he knew I robbed people before. He asked me if I wanted to make any money. I told him I could use some. I went inside my Mom's bedroom and got the gun out. It was a 22. It belonged to my Stepdad . . . I told him I was not going to be the one to shoot anybody, that he would have to be the one with the gun. He said O.K." When they left Becknell's home Huelsman was driving, but later on he turned the wheel over to Becknell, who drove into the service station where Duncan was sitting or lying in the driver's seat of his automobile, giving the appearance of having "passed out." Becknell "pulled up beside his car and Phil shot . . . I went in and tried to break into a cigarette machine. After I done that I saw

Phil bent over the old man and then I went back and got in the car."

Though it is not in the record, it appears from the testimony that an examining trial for Becknell was held in the county court on August 30, 1973, and that the attorney who later represented both defendants in the circuit court was present, representing Huelsman. Whether he was representing Becknell also is not clear.

The indictment was returned on October 8, 1973. A "memorandum of arraignment and plea" indicates that an arraignment was held on October 9, 1973, and that court-appointed counsel, Hon. William Knapp, entered a plea of not guilty. The trial took place on October 17–18, 1973.

At some time prior to the trial date Becknell chose to plead guilty, so that the posture of the case when the *voir dire* began was that Becknell was pleading guilty and Huelsman was pleading not guilty. However, as the questioning of prospective jurors progressed Mr. Knapp advised the court that Becknell was changing his plea from guilty to not guilty.

In the course of proving its case the Commonwealth, after having produced other supporting evidence, had Huelsman's confession read to the jury and filed as an exhibit. For some reason, however, although Becknell's confession was referred to in the testimony and appears among the' exhibits at the end of the transcript, there is no indication that it was ever read to the jury or introduced as an exhibit.[3] After the Commonwealth rested its case, Becknell and then Huelsman took the witness stand and each testified in his own behalf.

The story told by Huelsman at the trial substantially coincided with the confession he had signed on August 27, 1973, but with these differences: whereas in the confession he had quoted Becknell as having sug-

---

2. In his testimony at the trial Becknell defined this substance as "a pain pill and a downer to knock you out and it makes you feel drunk." He explained that he had been a drug addict for some time.

3. The statement in Huelsman's reply brief to the effect that it was read to the jury during cross-examination of Becknell appears to be in error. The transcript indicates that the statement read by the prosecuting attorney was Huelsman's confession, as later mentioned in this opinion.

gested that they "knock off" a filling station, he testified that Becknell "said something about getting some drugs at a filling station and the way that I took it, was that he was getting drugs at this filling station;" and though reiterating that he was "all shook up and dumbfounded because he shot that guy," Huelsman admitted under cross-examination that when he and Becknell left Becknell's house on the night of June 18, 1973, he knew Becknell had "talked about" robbing a service station and knew also that Becknell "had the gun."

Becknell's recitation of the events in question differed radically from what he had said in the confession which, as we have said, appears somewhat apocryphally with the transcript of evidence. The major substance of his testimony agrees with that given by Huelsman. According to Becknell, "I said to him something like let's hit a Sunoco station. The money wasn't the only thing we went for because . . . Mr. Duncan dealt in narcotics and I knew that . . . I was the one that shot Mr. Duncan. I plead guilty to that but I believe if I hadn't had the drug problem I wouldn't have done it." On cross-examination the whole of Huelsman's confession (which, of course, had already been introduced by a witness for the Commonwealth) was read to him and he was asked whether several of the statements in it were true. Some of it he confirmed, and as to the remainder he said he did not remember. He said that he had been to this particular service station several times before the shooting but did not know whether Huelsman had ever been there. When asked why he killed Duncan he replied that he was afraid Duncan would recognize him and tell the person who was supplying the drugs for Duncan to sell.

■ With respect to the failure of the trial court to conduct an *in camera* hearing to determine the voluntariness of Huelsman's confession, we think the dispositive answer is that counsel did not ask for it. Moreover, the testimony subsequently given by Huelsman made it abundantly clear that the confession was made freely and without coercion or pressure of any kind, and after

Huelsman had been carefully advised of his right to remain silent. We find no violation of his constitutional protections.

In previous opinions beginning with *Maye v. Commonwealth*, Ky., 386 S.W.2d 731 (1965), we have sought to warn against the danger of conflicting interests when two or more defendants in a criminal trial are represented by the same counsel. See *Maynard v. Commonwealth*, Ky., 507 S.W.2d 143 (1974). Although counsel did not bring the question to the attention of the trial court, as had been done in *Maynard*, we might very well be disposed to reverse this conviction were it not so obvious that there was no prejudice, at least to Huelsman.

■ As matters stood when the *voir dire* commenced, Huelsman had given the police a written statement to the effect that Becknell shot the murder victim and Becknell had given them a written statement that Huelsman did the shooting. In that posture, it was in the interest of each defendant to prove the other a liar. That was an unmistakable conflict. Both statements having been made before counsel was appointed for either defendant, if counsel was aware of it he should have declined to serve for both and so advised the trial court. The trial court, on the other hand, ought not to have appointed the same counsel for both defendants in the first place. The necessity of keeping two defenses in harmony unavoidably restricts the lawyer's freedom to advise either defendant to cut loose and go his own way. He cannot conscientiously advise one client to save his own neck at the expense of the other client's neck. So they are handcuffed, to sink or swim together, whereas if they had separate counsel each could chart a separate course and steer it to suit his own vision of the road to salvation.

Be all that as it may, when we reflect on the circumstances as they unfolded in this case the unspoken fact that stands out most prominently is that Huelsman actually benefited from the dual representation. Before counsel was appointed for both men Becknell had made a written statement accusing Huelsman of the shooting. After-

ward, he admitted having done it himself. In his testimony he said nothing that did not substantially coincide with what Huelsman had to say in his own defense. Though Huelsman's appellate counsel cites Becknell's testimony that he had suggested "knocking off" a service station as undermining Huelsman's defense that he did not intend the consequences of the venture, it can scarcely be overlooked that these were the very words used by Huelsman himself in making a written statement to the investigating officers before Becknell ever said anything at all. Beyond any reasonable doubt, there simply was not any prejudice to Huelsman by reason of his counsel's representing Becknell also.

The judgment is affirmed.

All concur.